Fourth and final day of our sitting here in Jacksonville. Pleased to be with you. Before we get going, just a few brief primers. Number one, please know that we have read your briefs, the cases, the statutes, the record materials, and so you've got limited time before us, so don't waste your own time with a bunch of factual and procedural ramp up. Just get right to it. Number two, there's a traffic light system that you'll understand implicitly, I think. Green is go, yellow is slow. When the red light goes off, please wrap it up. I'll try not to cut you off in the middle of the sentence, but do respect the court's time and wrap it up. The last thing I'll tell you is please make sure you speak into the microphone. We want to make sure that the audio is captured for those listening outside. And there's a green light at the base of the microphone that you'll see. If it's green, you're good. Usually we can hear if something up there goes sideways, and we'll stop you and tell you to sort of get the audio back on. All right. With that, let's call the first case, United States v. Shirley, 24-10-672 and 24-10-937. Mr. Fletcher here for the appellant, Mr. Kehoe here for the appellee. Mr. Fletcher, I see that you were court appointed. Thank you very much for your service to your client and to the court. Can I begin, Your Honor? You may. My name is Kyle Fletcher on behalf of the appellant, Mike Shirley, Your Honor. I'd like to give an opening statement, and I'll end up with a thank you for the opening statement. Your Honor, the government has a corpus delicti problem in this case when it was at trial. They never produced the body of evidence that established that there was actually a bribe. Therefore, the trial court erred when it did not grant the motion for acquittal because if you look at the evidence, it's true that Mr. Ellicott did not open an alleged envelope that he supposedly got from Mr. Shirley. That's what he testified to. And therefore, it's true that Mr. Ellicott had no idea what was in the envelope and that if there was any money, he had no idea. It's true that he did not know how much money. Therefore, there's no direct evidence that Mr. Greenberg received any money from Mr. Ellicott or therefore from Mr. Shirley. It's also true that there was no direct evidence that deposits were made by Mr. Greenberg via any receipts from any money from Mr. Shirley. And it's also true, Your Honors, that the direct evidence that never established a quid pro quo from Mr. Shirley to Mr. Greenberg, which is required by law to establish that there's a kickback, is said in the Snyder case and the Fernandez case. So therefore, there was never an acceptance of a bribe. There was no evidence of a bribe. If you indulge me just for a moment, I remember in true detective, Woody Harrelson stated, you cannot let your theories become your facts. And I think Mr. Shirley was found guilty based upon theories, not facts. And the reason I say that is because there was quite a lot of circumstantial evidence in this case. And I think when the trial court denied the motion for acquittal, if you will indulge me another analogy, there was like circumstantial evidence was like a lot of smoke in the courtroom. The circumstantial evidence can be proof. Yes, Your Honor. As much as direct evidence, sometimes even better. Yes, Your Honor, but I think you still have to have some kind of direct evidence. You say there was no quid pro quo. $6,000 purportedly was paid to your client. That's true, Your Honor. In return, he got what I think some people would term a sweetheart deal. Why is that not quid pro quo? Well, to be a quid pro quo by the law, Your Honor, it has to be up front. It's got to be before that act. If you're starting getting favors from someone, a public official, and then in the middle of that, and that's the timeline we have in this case, he supposedly then gave him $5,000 or $6,000. That's what you call a gratuity. That's not a quid pro quo, and that doesn't meet the definition of a bribe because a bribe by law has to happen beforehand. Well, it does if it's arranged beforehand. I mean, you can have a bribe where it's, you don't have to, the law doesn't, I mean, the law doesn't require you to pay the bribe beforehand, right? As long as you have the arrangement beforehand. That would possibly be true, but I don't see any evidence whatsoever that there was an initial bribe, a conspiracy to establish a bribe that you're going to be paid down the line someplace else. But let's also, let's look here. Let's look at the big evidence. That's where the circumstantial evidence comes in. Obviously, no one, your clients are going to come in and say, I had an arrangement with Mr. Ennicott and Mr. Greenberg to take a bribe or to give a bribe, but jury can take the circumstances and infer from those circumstances that there was a quid pro quo. A payment, a sweetheart deal, they go together, quid pro quo. Well, think about that. It's $6,000, allegedly, Mr. Shirley got paid $600,000, and Mr. Greenberg gets paid $6,000. If you're looking at the evidence in the best favor to the government, I think that if that's really going to be a quid pro quo, I'll be asking for a lot more money than $6,000, $600. That just shows Mr. Greenberg wasn't a good negotiator, maybe. Mr. Greenberg is a pretty rich man on his own. I don't know that he needed $6,000. But the fact of the matter is, I don't know that still, the evidence, the body of the case, the corpus delecti as presented to the jury did not have a direct evidence enough for a reasonable jury to determine him being found guilty, Your Honor. And to get back to my analogy there, I think that that's why the motion for acquittal should have been a cloud. I want to move on to issue one, Your Honor. I'm going to skip these, go through these very quickly as I can. But issue one was about the preponderance of the evidence establishing the fact that there was a groundwork to allow the, allow the. If you don't mind, make sure you stay centered on the mic. To allow the co-conspirator hearsay in. I know the government's going to say that, once again, there was an implication that that was on the record. But I think the case law says it's got to be established on the record. There's something somewhere. One of the cases I cited said there had to be a, the magistrate found that there was a conspiracy by the preponderance of evidence. In the trial court, there was never, nothing ever said defined by preponderance of the evidence. And it can't be implied either because the implication would be subjective. And I think it either has to be, if it's going to be implied, it has to be a necessary implication. Not just a regular implication, just some common dairy implication. Because if not, then it's subjective. And making that finding is part of the burden of proof of the government. And the government never even asked for that to be found. And so therefore, I think Mr. Ellicott. The first point I think you're making is that it wasn't hearsay to begin with. It was not offered for the truth of the matter asserted in the statement, but merely to show someone acting upon that statement. Well, in that regard, was there a limiting instruction with regard to that? And I'll ask probably the same thing. I think there was a limiting instruction in regards to questioning Mr. Ellicott about his sexual... About with regard to, comment with regard to your number, what we're talking about right now. Was there a limiting instruction? This can only be considered for... Yes. Was there a limiting instruction with regard to... But I still submit that it was still hearsay, specifically from Mr. Greenberg. And that would be considered, hearsay is considered circumstantial evidence too. It's not hearsay if it's offered for something other than the truth of the matter asserted. The government takes position it was not offered for the truth, but rather to show what someone did in response to that statement, which would take it out of hearsay to begin with. But usually in that circumstance, somebody asks for a limiting instruction, which tells the jury they can only consider it for a certain purpose. That was given, yes, your honor. But that also, I mean, you're making me think about another issue here, and that goes to the ineffective assistance of counsel because they allowed him to testify as to what he thought was going on. Was there a bribe? I'm paraphrasing here. They basically asked Mr. Ellicott, was there... First, you didn't think it was a bribe, but was there a bribe? That right there, but I'm skipping up to issue six now. But that right there, you know, that should be remanded based just simply on the ineffective assistance of counsel because the jury was swayed by what Mr. Ellicott was allowed to testify to and not even objected to in the fact that he gave his own opinion as to the fact that Mr. Shirley was guilty without any objection. And so that flavors this whole case as far as his testimony goes here. As to issue two, being able to testify, I mean, cross-examine Mr. Ellicott on his history and the other cases that he was subjected to, sexual cases. That was a violation, a brutal violation, your honor, an inability to cross-examine the defendant. And there's the Wasco case that we cited in that brief. That case, he was allowed to cross-examine someone on his sexual offenses. Now, the Wasco case, they found that that didn't really matter, but he was still allowed to. And here, I think the jury were at least allowed to be able to see why it was to be able to impeach Mr. Ellicott for his testimony, his self-serving, and also the fact that it's a violation of the Bruton violation,  Why wasn't it enough to allow the cross-examination that the district court allowed here, which is to ask him questions about these sex-related offenses, but then he can plead the fifth? Well, it kind of got so mixed up there in the transcripts, and I think they stopped, he started taking the fifth on certain questions he shouldn't really have allowed to have been able to take the fifth on. I think he was just saying, if you say, hear the word sex, or about this, about his involvement with the underage people, he was going to say, take the fifth. And this goes to ineffective assistance of counsel, and it also goes to- But how would it, I mean, your cross, I mean, the reason why this is relevant is because of his credibility, or, you know, not you, but a trial counsel, I guess, was trying to impeach him. It seems like it's pretty good impeachment for him to be taking the fifth. I guess I'm trying to figure out how him answering questions and denying that he did anything wrong helps you more than him saying, like, I'm really concerned that I've committed multiple crimes against children, so I'm taking the fifth. I understand what you're saying, but we asked for an instruction on that, or to disqualify him as a witness, and the court, I do believe, denied that, Your Honor. You know, to give- He was asked dozens and dozens of times, and he took fifth dozens and dozens of times, right? I think the jury's sitting there seeing what's going on. They should have a pretty good idea. That's true, but that's- You may have to have a balance here of the relevance of the testimony, then protecting the witness's Fifth Amendment rights. Well, that's a theory. I mean, there's also the true testimony, being able to get out exactly what Mr. Ellicott was dodging, you know, the facts of the matter, you know. Why? Because- How does that impact whether your client is guilty or not guilty? It was a totally collateral issue to begin with. It goes to him. Like I said, it's a brutal issue regarding whether you have the opportunity to clearly to cross-examine the witness as you see fit. Okay, great. Thank you. You've got some rebuttal time remaining, five minutes. Mr. Kehoe, let's hear from you for the government. Yes, Your Honor. Good morning, Your Honors. Gregory Kehoe on behalf of the United States. I will address just a few salient facts as it pertains to questions asked by Judge Huck. I know Your Honors have full knowledge of the facts, but just bearing recitation because of the timing of the $6,000, Judge Huck is extremely important. As Your Honors know, this was a contract that was entered into with Mr. Shirley literally when Mr. Greenberg came in as the Seminole County tax collector. He gave him a $12,500 a month job through a company that Shirley had just formed called Praetorian to do any number of things and we can go through the recitation of what those things are. The fact remains that while he did some reprinting and some rebranding, virtually everybody said that they couldn't describe what Shirley did other than sit around the office and chat with Mr. Greenberg and drink coffee, except of course on one occasion in a rather black humor, he came across, said hello and people in the office said that was a $4,000 hello. The fact remains that people in there didn't even know what he was doing. He also contracted with third parties, this company called Aris, to do quite a few of jobs that he was delegated to do in that he not only marked up those invoices, unlike a retailer, he was not a retailer, he marked out those invoices from 20 to 96%. In fact, he inflated the actual amount of goods that were in fact produced. During the period of time we're talking about, he took in over $600,000, over $492,000 from Praetorian alone, with a profit from Aris of almost $45,000. In the midst of this, and this goes to the question, Judge Hook, that you raised with regard to the $6,000, the $6,000 that he said was a loan, of course, that was not for the truth of the matter asserted, but it was certainly part of disguising what he was going to do, but even if it wasn't for the truth of the matter asserted, it certainly was a comment that was in furtherance of the conspiracy. Tells Ellicott, the bag man, to go pick up this money because he wants a loan from Shirley. Shirley goes that same day and withdraws $6,000 in cash. By the way, his bank records reflect that he had never done so before, not in that kind of denominations. The $6,000 go to Greenberg. On the way out, Shirley tells Elliot, by the way, I have this contract for, I want a percentage of your coin business, 10% for 5,000, and that's to try to cover this $6,000 deal. The money then goes to Greenberg that day. Greenberg, three days later, makes two different deposits in cash, two different accounts, one at $3,010, another at $3,010, and on the same day, he moves the $3,000 he deposits into another account, which he then pays shortly thereafter a credit card on about the next day, I believe it was, September 29th. By the way, with regard to this cover-up on the coin deal, that changes a little bit during the investigation, and you'll also see Mr. Shirley telling Mr. Ellicott, oh, by the way, we're going to forget about the coin deal, and we're going to tell you that this $6,000 was for furniture. Why is this $6,000 timing important? Because if you look at the actual invoices that come through from January to September, the $12,500 are supposed to be transition invoices, transition being Greenberg coming into the job. That changes in October after the $6,000 payment is made, and the payments are now for strategic management services. So there's a shift in exactly what they're going to be because obviously it's no longer a transition. By the way, during that same period of time in November of 2017, there are two checks from Shirley to Greenberg, one for $5,500 and one for $7,000. There's no further explanation other than those checks are going from Shirley to Greenberg during that period of time. With regard to co-conspirator statements, you're absolutely right, Judge Huck. These are not for matters for truth in the matter asserted. It was a lie. It wasn't a loan in any way, shape, or form. Nevertheless, it was part and parcel of the conspiracy to get this money and also part and part of the conspiracy and furtherance of the conspiracy to hide it. Yes, Judge? To follow up on Judge Huck's question, was there any sort of limiting instruction about this? My understanding was it just came in. I think it just came in, Judge. And I'd have to go back for the record, but my recollection as an officer of the court was it just came in. In any event, however you want to pose it, it was certainly a statement of furtherance of the conspiracy. Conspiracy to take the bribe, the conspiracy that was charged in the indictment, and of course, the conspiracy to hold it. Somehow, counsel seems to argue that there has to be some preliminary assessment on a conspiracy before those statements come in. That hasn't been the law in the 11th Circuit since the 11th Circuit changed from the 5th Circuit, going back from as early as 1981. The individual statement of a co-conspirator can be used to determine whether or not it's a conspiracy. So with all due respect to counsel, that has not been the law, and there have been recent reiterations of that law by this court, U.S. v. Carton and U.S. v. Miles. With regard to the Confrontation Clause issue, there is no substance to that per Crawford v. Washington, the Supreme Court case. And why? Because co-conspirator statements under 801 D2E don't violate the Confrontation Clause because they are not testimonial in nature. And that is validated by United States v. Holland, a case of this court. With regard to the issue brought up on the invocation of the Fifth Amendment, the Fifth Amendment issue came up not with regard to the substance of what Ellicott pleaded guilty to. Ellicott was asked any number of questions about what he pleaded guilty to, his bias, what he was interested in getting. All of those issues went on, not only in direct examination, but on extensive cross-examination. And he was asked questions about the sex-related issues, the substance of those sex-related issues, which Judge Presnell, in his discretion, agreed were, in fact, collateral to what was going on. What defense was, what Mr. Shirley was allowed to get it into, his motive to cooperate, his bias of any, that he gave full range to that. And if we look at the jury instructions, which are all the more important, there were five separate instructions given by Judge Presnell to the jury on how to assess a witness's testimony. And that goes into the reasons for not telling the truth. Again, bias and motives. Consider that the defendant, such as Ellicott, had pleaded guilty and was convicted of a felony, that he was an accomplice testimony, he was looking for favorable treatment. All of the standard instructions of the Eleventh Circuit were given by Judge Presnell in this matter. Judge Presnell, quite simply, did not abuse his discretion in refusing to give that, strike this witness's testimony. With regard to the honest services argument, there is some argument that there is, there is some type of amendment to this case. Yeah, so, so if I, there's, you're about to start talking about the, the prosecutor's closing argument, and I did have a question about that. So, how, how, what is the government's theory of honest services fraud? I think I understand it, but just explain what your theory of honest services fraud is. The, the honest services fraud, well, in this particular case, how is this case, how is this tried, Judge Brash? It was tried that, that the person that was taking the bribe or the kickback was Greenberg, and the person that was offering, offering it was Shirley. Now, does Shirley, there seems to be some indication coming from the defense on Percoco that there is no responsibility for someone in Shirley's position to deal with public officials honestly. That is simply not the case. Percoco says just the opposite. If you have delegated authorities, and if you're operating on behalf of the agency, you have the duty to provide services honestly. And this particular... Was that, was that the government's theory, I guess? I mean, I, I thought the way the government's theory worked is that Greenberg owed honest services and then Shirley conspired with him to, you know, violate honest services. I'm, I'm raising the issue with regard to that. That's exactly what happened. But with regard to the status of Shirley himself, Shirley, because of his position, has a responsibility to give services that are honest to the public official. So if you look at the... You know what, it might be a little confusing. This case is a little different than the typical bribery case. It is. Usually you would get a contract to build a bridge or something. Right. In this case, because of the nature of the, I'd call it a sweetheart deal, it put him in a situation where he could be considered to be a public official. Well, theoretically, he could. I think it created a little confusion here. Yeah, yeah. And the closing argument kind of muddied the water a little bit further. But I think I understand your theory, arguing to the jury, that the deal was a sweetheart deal. Part of the reason is because he got paid for something he didn't give. Yes. I think that's where the confusion comes. And I would concede that, especially during the charge conference, Judge Huck, there was some confusion in that regard. But the case had been indicted and charged a particular way. And even the government's final argument was that the public official who took the bribe was Greenberg and the individual who was responsible for doing it and giving that bribe was, in fact, Shirley. Somehow the defense seems to think that, oh, Shirley is just like the guy who comes in and is the plumber and has got no responsibilities to give honest services to a public official. To treat, not honest services as the term is under the statute, but just to give services that are honest. But he is. He does have that responsibility. That he, in fact, has the responsibility. I get it. I just see it's a little different than you might usually have. But going back to... He was not supplying toilet paper. That's right. He was providing transition services. He was providing efforts to modernize the court. He worked on the budget, strategic planning, technological review. Was the jury instructed about that theory? I read the jury instructions to be the kind of theory that I just laid out, that Greenberg was the official and Shirley was conspiring with him and not that Shirley was an official. No, and you're 100% right. The case went through on that theory. But the defense has raised the argument that Shirley has got no responsibility to give services that are honest. And that's simply not true. Well, but I guess I'm saying... I mean, I realize that's their position. I guess my question is, is that something that was ever going on here in this case? I mean... Not really. It had been raised in the post-trial briefs and it had been raised in motions, the Rule 29 motions, et cetera, as if the theory had changed. It came up because the argument was that the theory had changed. But the theory had never changed, you know, Judge Brasher. The theory had always been that the public official that was bribed was Greenberg and that the individual doing the bribing was Shirley. So their argument that the theory changed is based on this statement that the prosecutor made in closing, where he said, quote, Shirley works for a government agency and he owes the public a duty of honest services. So I think that's their position, is that when the prosecutor made that statement, he was changing his theory to say, actually, you should convict him as if he's the public official. Well, I think that that probably was not the most accurate way to advance that position. But if he's part of a criminal conspiracy, Judge Brasher, and he's in this criminal conspiracy with Greenberg, he does have a responsibility to deal with Greenberg honestly. Now, the term honest services is something that's bandied about in 1346. But what we are talking about is, and I believe that the prosecutor is advancing in that argument, that he has a responsibility to honestly deal with the public official. And he didn't do it here. He bribed him. He got into a sweetheart deal. He bribed the official. And as a consequence, he was part and parcel of the conspiracy under 1343 and 1346, as well as 1349. Maybe the reason I'm likewise kind of confused here, because I guess I've never thought of the honest services fraud statute as imposing a duty on someone who is not a government official to provide honest services to the government official. I've always understood it to be that the government official owes a duty to provide honest services to the public. And it sounds like that's the core theory here. And I think this gets back to Judge Brasher's question. All you're really saying is that this guy was mixed up in a conspiracy with the public official who himself was denying the public honest services. But it seems to me to confuse things to keep saying that this conspirator, this co-conspirator owes himself a statutory obligation to provide honest services to the public official. It just seems like the arrow is running in the wrong direction. I mean, I think it's probably, it's become a little bit too complex. And yes, you're right that this person, a guy, somebody like Shirley has got to deal with the public official honestly, or else we're going to get in some type of corrupt entity, which is what happened here. I have a little different take on it. It seems, and I have not talked to the prosecutor, and you apparently have neither, as to what his thinking was in his closing argument. But I had interpreted that as being his argument to show that the contract that he had, that Mr. Shirley had with the state was a sweetheart deal, I'll use that term.  And he had to perform proper services, and he didn't in this case, which is evidence of the nature of the sweetheart deal, as opposed to some obligation to, some vague obligation to expect services going back and forth. I just think that comment was a throwout comment that was a little confusing, but I think I understand why he made that comment. I do think that under the circumstances of using the honest services terminology, it was a bit confusing. I agree, Judge Huck and Judge Brasher with regard to that, and Judge Newsom. Nevertheless, I do think if we look at the jury instructions as a whole, Judge Presnell accurately set forth the law. Much of these conversations that are taking place, obviously there is some conversation during the charge conference, but it's also a conversation that is taking place, you know, there's one comment during the final argument, but it never changed what the ultimate way this case was tried, which was that Greenberg was the public official taking the bribe and giving the sweetheart deal, and that Shirley was the one that was paying that bribe. Very well. Thank you so much for your presentation. Mr. Fletcher, you've got five minutes of rebuttal time. Mr. Shirley wasn't charged with the sweetheart deal. He was charged with bribing a public official. By sweetheart deal, let me clarify that. He got a contract for which he didn't perform services, appropriate services. Yes, Your Honor. Maybe no-show job is the right, no-show job. The contract was written by the state, by the government he's working for, and it was identical to the other contracts that were written from those people. If he's getting $12,500 and doesn't show up, doesn't do anything of a material nature, that's what I mean by sweetheart deal. I understand that, Your Honor, and I think some other identity was also getting $12,500 too at that time from the taxpayer's office, and they weren't charged with bribery. So could you answer this question, sir? I mean, the government, it seems like, could have pursued a theory that Shirley owed honest services because of this arrangement and that he himself was a public official, but it doesn't seem like they did pursue that theory. It seems like their theory was that Greenberg was the public official and that there was a conspiracy with Shirley to get Greenberg to deny honest services to the people through this kickback scheme. And so, if that's what they pursued, then how does the jury instruction issue or the prosecutor's closing issue really make a difference? First off, I don't think they established there was a kickback or that there was a bribe, but also, except that, well, I think that there's, and I went into what the jury instruction problem was, there was no guardrails in these jury instructions as I think in the Sen. Wren case, where they say, you need to define who the public official is and what happened to that public official. Here, it seems like, yes, your honor. The instruction also require a payment of a receipt of a bribe and describing who the public official was and only one person was ever receiving a bribe and that was Mr. Shirley. Maybe Mr. Greenberg, you mean. Excuse me, Mr. Greenberg, I'm sorry. That's true. And Mr. Shirley did. But no one was, because they changed courses in the middle of the stream near closing because I thought, my thinking is, is they said we don't know we've got enough here to show that Mr. Greenberg got a bribe, but Mr. Shirley violated his duties as a public official. And that's what I think Judge Brasher went into. And if that's the case, well, then they changed the theory of the case and really the charge here. And the jury instructions. What about this? I'm sure the instruction was given what the lawyers say is not evidence in this case and the judge instructs them in the law. So even if that were the case, the jury had been instructed that what the lawyers say is not evidence and then the judge instructs them as to what the law is that they have to follow. That's true. And we assume that the jury followed the judge's instruction. Well, I don't think we're allowed to find someone guilty on assumptions. You have to do it on what the evidence is. And I don't think we have to, I think it's not fair to Mr. Shirley in due process to read between the lines what we think a jury did and didn't do. No, I'm not saying that. I'm saying the jury's instructed to follow the law. The jury's instructed that what the lawyers say is not evidence. That's true. To put those two together, offhand comment, putting argument seems to be... But it's also going to go to the fact that ineffective sets of counsel because they failed to object during closing arguments that he's now changed his theory in the middle of the case that doesn't fit the evidence that's been presented at that juncture. But once again, the jury instructions didn't put guardrails in there to make people to do it right. The Zinn-Wren case shows you how it's supposed to be done in these kind of cases with jury instructions and that wasn't done here. And I'd like to point out one more thing too. The requirement that someone receive a bribe is a beautiful thing before someone can be found guilty. Yes, Your Honor. Isn't that the guardrail? That's true. But once again, there's also the jury instructions is supposed to show that the definition of a bribe under the case law and the law, he has to be up front. He has to receive monies up front. That didn't happen in this case. This clearly doesn't happen. That's why I'll keep saying it over and over again. There was no bribe technically. You can look at it and say this stinks like, looks like poop, smells like poop, but it just didn't poop in this particular case. And further though, to make a point, Simonelli's clear that the state contract matters should not be criminalized and that's what basically happened in this case. Maybe Mr. Shirley should be addressed by the Attorney General's office or somebody else. He should be sued or something. And also along with Mr. Greenberg, Mr. Greenberg and Mr. Shirley, whatever it was that they did, if they did anything right, it would not be a crime. Your Honor. All right, very well. Thank you so much, both of you. The case is submitted. We'll move to the second case. Just saying.